UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 18 CR 809 |
| v. | ) | |
| | ) | Honorable Jorge L. Alonso |
| KINGA POLITANSKA | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT KINGA POLITANSKA'S OBJECTIONS
TO THE PRE-SENTENCE INVESTIGATION REPORT
<u>AND POSITION ON SENTENCING</u>**

## TABLE OF CONTENTS

I.     **INTRODUCTION** ............................................................................................................ 1

II.    **PROCEDURAL AND LEGAL BACKGROUND** .......................................................... 2

III.  **DEFENDANT KINGA POLITANSKA'S OBJECTIONS AND CORRECTIONS
TO THE PRE-SENTENCE INVESTIGATION REPORT ("PSR")** ............................ 2

          1.     The actual loss sustained by Chase Bank should be the loss
calculation under the guidelines................................................................ 5

          2.     The Government's loss calculation under the guidelines seriously
overstates the gravity of the Defendant's conduct and over
represents her culpability. ........................................................................ 7

IV.  **THE SECTION 3553 FACTORS** ........................................................................ 8

      A.    An Individualized Assessment of Kinga's Personal History and Characteristics
Merits Consideration for a Downward Departure
Including a Non-Custodial Sentence .................................................................... 9

          1.     Kinga's background and personal circumstances provide the proper
context to consider her conduct. ............................................................. 10

          2.     Kinga's status as a victim of systematic physical and mental abuse
independently supports a decision to impose a non-custodial sentence. .. 14

          3.     Incarceration would have a devastating impact on her children.............. 18

      B.    The Letters of Character Describe a Person Who Has Demonstrated True
Character and Decency ........................................................................................ 21

      C.    A Sentence Below the Advisory Guidelines Which Does Not Include
Incarceration Would Afford Adequate Deterrence............................................... 23

      D.    There is No Concern The Public Needs to be Protected From Further
Crimes of Kinga.................................................................................................... 24

      E.    A Non-Custodial Sentence Would Constitute a "Substantial Restriction of
Freedom" Sufficient to Punish Kinga For the Conduct For Which She Has
Accepted Responsibility ....................................................................................... 25

V.     **CONCLUSION** ................................................................................................. 26

**DEFENDANT KINGA POLITANSKA'S OBJECTIONS
TO THE PRE-SENTENCE INVESTIGATION REPORT
AND POSITION ON SENTENCING**

Now comes the Defendant Kinga Politanska ("Kinga") through her attorneys Ronald D. Menaker and Nancy L. DePodesta of Saul Ewing Arnstein & Lehr LLP, and respectfully submits the Defendant's objections to the Pre-Sentence Investigation Report ("PSR") and position on sentencing. Kinga is scheduled to appear before this honorable court for sentencing on March 3, 2020 at 2:00 p.m.

## I.    INTRODUCTION

Kinga Politanska is a 46 year old single mother of three children. As a child age seven she was the victim of a violent sexual assault which has left a profound effect on her life. For much of her adult life she has endured physical and mental abuse at the hands of male companions. It is no wonder she has been treated for anxiety, chronic depression, and post-traumatic stress disorder. To be clear, it is not Ms. Politanska's intention to minimize her wrong doing or the seriousness of her conduct. Rather, it is an attempt to put this offense and her behavior in its proper context. She has repeatedly acknowledged her involvement in this offense. From the inception of the investigation that resulted in this indictment she has strived to make amends for her conduct. Almost immediately, she accepted responsibility for her behavior, provided truthful information and testimony to the government, and fully and substantially cooperated with law enforcement. Unfortunately, there is no way to go back in time to change what occurred. Instead, on a daily basis, Kinga has felt personal shame for her conduct and has tried to do her best to "undo" any wrong, even before criminal charges were filed.

As set forth in greater detail in this submission, it is our hope that this honorable court will impose a sentence below the advisory sentencing guidelines range; specifically, a non-custodial sentence when it considers all available sentencing options irrespective of the

guidelines. Because federal law does not authorize probation for Ms. Politanksa's offense of conviction, a sentence of home confinement or supervised release, with necessary conditions, or both, is sufficient but not greater than necessary to comply with the goals of federal sentencing set forth in 18 U.S.C. § 3553(a).

## II.   PROCEDURAL AND LEGAL BACKGROUND

On September 4, 2019, Kinga Politanska pleaded guilty to a single count of bank fraud in violation of Title 18 U.S.C. § 1344(1). The maximum penalties for this conduct are a term of thirty years imprisonment and a fine of not more than $1 million dollars.

The PSR calculates a total offense level of 22 which, when combined with a criminal history category of 1 results in an anticipated sentencing guidelines range of 41 to 51 months imprisonment in addition to any supervised release, fines, and restitution the court may impose.[1]

## III.   DEFENDANT KINGA POLITANSKA'S OBJECTIONS AND CORRECTIONS TO THE PRE-SENTENCE INVESTIGATION REPORT ("PSR")

10.   Chase Bank did reverse a prior transfer of $735,000 out of Chase Account Number 2 to Citibank Business Account ending in 04739. This Citibank account was in the name of ABLX Trucking and controlled by Cristian Malec. Ms. Politanksa had no authority over this account. As set forth in the Government's version, Ms. Politanska did not "direct" Malec to request Citibank file a "late return claim." Rather, she "told" Malec he could request that Citibank file a late return claim with Chase.

---

[1] As will be explained in greater detail later in this submission, it is the government and probation's position that the offense level of 7 should be increased by 18 levels pursuant to guideline 2B1.1(b)(1)(j) because the intended loss of approximately $5,919,085 was more than $3,500,000 but less than $9,500,000. Taking into consideration a three level reduction in the anticipated guidelines sentencing range for acceptance of responsibility and a criminal history of 1, the total anticipated sentencing guideline range according to the government is 41 to 51 months. It is the Defendant's position that the loss should be determined on the actual loss of $768,921 that resulted from the offense. Using that loss amount and taking into consideration a 3 point reduction for acceptance of responsibility and a category 1 criminal history, the anticipated sentencing guideline range would be 18 or 27 to 33 months.

29.     The Defendant was never advised by legal counsel not to discuss her criminal history with the undersigned officer.  Defendant was advised in the presence of the officer not to provide a version of the offense as counsel would do so.

36.     On January 6, 2020, the charge of endangering the life/health of a child was stricken off call with leave to reinstate.

41.     Her father's name should be spelled Marek, not Merek.  His last name is Politanski.  Her mother's maiden name is Ostrowska.  Defendant's mother lives in Harwood Heights, Illinois not Hardwood Heights.

43.     Defendant's first marriage was to Piotr Szpyt in 1995.  They separated two days later and were divorced in Cook County, Illinois in 1995.

44.     Ms. Politanska's ex-husband is Aleksandar (not Aleksandor) Savic.  Her twelve year old son is named Nikola, not Niola.

45.     To Defendant's knowledge, Ilija Ristik does not own a trucking company.  She no longer resides with Ristik.  Defendant's daughter is Angelina, not Angeline.  Angelina does not live with the Defendant.  The Defendant told Ristik to leave the home in October of 2019.  On December 8, 2016, Ristik severely beat the Defendant causing a broken rib and bruising to her face and body.  Ristik was initially charged with several felony offenses including aggravated domestic battery and aggravated kidnapping but eventually pled to a misdemeanor when the Defendant refused to testify.  The felony counts were dismissed.

47.     The Defendant and Ilija Ristik were never married and Zhivko (not Zhivoko) Ristik is not her "ex-father in-law."  The Defendant does not recall telling the undersigned officer that Ilija "believes he and his current wife should have custody of the Defendant's five year old daughter."

48.     19 OP 20564 is an active Order of Protection in which the Defendant, not Ristik, is the Petitioner.

50.     The Defendant believes Anna is the legal wife of Ristik.

51.     The December 11, 2019 auto theft was reported to the Des Plaines Police Department and the vehicle was later recovered in Rosemont, Illinois.  It was processed for evidence with results unknown at this time.

52.     On December 16, 2019, an Amended Order was entered granting temporary physical possession of Angelina to Ilija Ristik "until further Order of Court."  Additionally, Kinga shall have no parenting time with the minor until further Order of Court.

58.     The Defendant believes she was diagnosed with attention deficient disorder prior to 2017.  She was prescribed Adderall.

60.     Defendant is currently taking Prozac 20 mg and Xanax 0.25 mg.

61.     As a condition of bail, the Defendant was ordered to submit to a psychiatric evaluation; not treatment.

71.     XTrade Sales 1 is not permanently closed.  It is still in business.  XTrade Sales, Inc. was changed to XTrade Sales 1 on April 25, 2017.

73.     Defendant was unemployed from approximately early 2017 through January 9, 2019.

75.     Luka Unlimited, Inc., was formally owned by Ilija Ristik.  It was incorporated January 7, 2008 and involuntarily dissolved on June 14, 2013.  The company served the trucking industry, not the taxi cab industry.

76.     Between 2005 and 2009, the Defendant was employed at Luka Trans, not Luka Transportation, Inc.  The company was located in Elk Grove Village, Illinois.

77.     Royal Transport has been out of business for several years.

36035051.10                                              4

80.     The Defendant no longer resides with her ex-boyfriend.  She does not include monthly rents paid on 1429 Granville because it is paid by XTrade Sales 1.  The Defendant owns the residence at 1030 Granville in Park Ridge where her daughter Angelina currently lives. Flagstar Bank holds the mortgage on the property.  The amount of the mortgage as of September 30, 2019 is $459,272.  The Defendant does not have possession of any of the vehicles listed as assets.  They have been taken or repossessed.  All of the vehicles had liens which were later charged off.

86.     The Defendant shares one-half interest of the Porsche Panarema with Ristik, not the Porsche Turbo 911.

88.     Ilija Ristik, not Risec.

89.     The Defendant will be unable to sell any of the listed vehicles because she does not have access to them and banks hold title.  Therefore, proceeds of the sale of the vehicles cannot be considered for purposes of restitution.  See No. 80.

## Loss Calculation

1.     **The actual loss sustained by Chase Bank should be the loss calculation under the guidelines.**

92.     USSG §2B1.1 which covers sentencing for various forms of fraud ties sentence to the amount of loss caused by the fraud.  In order to establish the applicable sentencing range for bank fraud under the sentencing guidelines, the district court is required to determine the amount of loss attributable to the scheme.  As a general rule, loss under the guidelines is the greater of actual loss or intended loss.  USSG § 2B1.1 App. N. 3(A).  In calculating the loss amount in this case the Government and the PSR rely on the total amount of deposits made at Chase Bank rather than on the amount of cash withdrawn against them.  It is the Government's position that the Defendant intended to withdraw cash representing the total face value of all of the checks she

had deposited. In other words, the Government contends that the true measure of the Defendant's culpability is the intended loss or the pecuniary harm the Defendant purposely sought to inflict.

The Defendant agrees that the Government's approximation of the deposits is correct but argues that the amount of loss should be the reasonably foreseeable pecuniary harm that actually resulted from the Defendant's conduct; not the intended harm. Here, Chase Bank either never lost funds or eventually recovered all but $894,455.39 from both schemes. As this court is aware, there is a four level difference in offense level between the intended loss and the actual loss amount.

It is the Defendant's position that in a check kiting scheme, such as this, the actual loss should be the loss amount reflected in the guidelines. In *U.S. v. Mau*, 45 F.3d 212, (7th Cir. 1995) the defendant engaged in a check kiting scheme to repay a series of loans he obtained from a bank. During the kite, Mau deposited checks worth $13,999,042 into various accounts he controlled, of which $12,800,722 were from checks written from one of the three accounts he controlled to another. When the bank ended the scheme, Mau had an overdraft of $69,862.86.

At sentencing Mau contended that he intended to repay the bank the full amount of the overdraft by signing a note to address the kiting and thus he intended to cause no loss. The court disagreed finding the loss amount of $69,862 the net detriment to the bank.

> "Check kiting crimes because of their particular nature are crimes where the district court must calculate the victim's actual loss as it exists at the time the offense is detected." at 214, accord *U.S. v. Schaffer*, 35 F.3d 110, 114 (3rd Cir. 1994).

It is important to note that the amount of the deposits made as part of the kite were not considered as the loss amount under the guidelines.

Here, in 2016 $5,919,085 was deposited in Chase Bank, as the parties agree, but the actual amount Chase Bank was owed when the kite was detected was substantially less.[2] Therefore, this court should accept the actual loss as the proper amount under the guidelines.

Even if this court accepts intended loss as the appropriate loss amount the court must find the extent of loss the Defendant actually intended to impose on Chase Bank. In *U.S. v. Higgins*, 27 F.3d 1070 (7th Cir. 2001) the Seventh Circuit discussed the issue of actual loss versus intended loss in check kiting cases.

> "Intended loss analysis, as the name suggests, turns upon how much loss the defendant actually intended to impose on the financial institution… the district court must find by a preponderance of evidence that the defendant intended to impose on the financial institution the particular amount of loss for which he is to be sentenced."

*Higgins* at 1075. *See also*, *U.S. v. Fleming*, 128 F.3d 285 (6th Cir., 1997) ("before the district court may enhance a defendant's sentence based upon the intended loss, there must be evidence sufficient to show that (1) the defendant intended the loss (2) the defendant had the ability to inflict the loss and (3) the defendant completed all acts necessary to cause the loss.")

A finding of intended loss of $5,919,085 cannot be supported by a preponderance of the evidence. Therefore, the only calculable loss is the actual loss of $894,454.93 which would result in a 14-level increase rather than the 18-level increase urged by the Government.

> ### 2. The Government's loss calculation under the guidelines seriously overstates the gravity of the Defendant's conduct and over represents her culpability.

Once the court determines the appropriate loss amount under the guidelines it has the discretion to modify the amount to more accurately reflect the economic realities of the crime. *U.S. v. Lane*, 323 F.3d 568, 588 (7th Cir. 2003); *U.S. v. Stockheimer*, 157 F.3d 1082, 1089 (7th

---

[2] While the Defendant agrees with the amount deposited into Chase Bank, there remains some question regarding the actual loss to the Bank. According to Dawn Hardwick, Vice President of Global Security and Investigations, the Bank reversed all but $768,921.46 from other Banks. The Defendant has no way of disputing the accuracy of this deficit except to say her portion of the proceeds from this scheme was minimal at best.

Cir. 1998), *U.S. v. Studevent*, 116 F.3d 1559, 1562-63 (D.C. Cir. 1997). In other words, courts have recognized that in some cases intended loss may drastically overstate the gravity of an offense and over represent the defendant's culpability. In such a case the court has the discretion to depart downward. *Lane* at 588, *Studevent* at 1563. The Seventh Circuit has stated that fraud sentences should be grounded in economic reality and based on the actual risk created by the defendant, *U.S. v. Downs*, 123 F.3d 637, 644 (7th Cir. 1997); *U.S. v. Schneider*, 930 F.2d 555, 558-59 (7th Cir. 1991). Other Circuits have recognized that a substantial magnitude of a discrepancy between the actual and intended loss can seriously affect the fairness of a sentencing proceeding. See for example, *U.S. v. Fleming, infra*,

> "We have vacated sentences only in cases in which the total intended loss bore no relation to economic reality either because the defendant had paid back a portion of the fraudulently acquired loans, the defendant had only withdrawn a portion of kited checks, or the plan had no chance of success (citing *U.S. v. Watkins*, 994 F.2d 1192, 1195-96 (6th Cir. 1993))."

In this case the magnitude of the discrepancy between the actual and intended loss bears no relation to "economic reality" and seriously overstates the culpability of Ms. Politanska. For that reason a downward departure is warranted.

## IV.     THE SECTION 3553 FACTORS

In *Gall v. United States*, 128 U.S. 586 (2007), the Supreme Court made clear that the guidelines are truly advisory. The court rejected the government's argument that sentences significantly outside the advisory guideline range should be subject to exacting scrutiny on appeal, holding that "the guidelines are only one of the factors to be considered in imposing sentence…." 128 U.S. at 602. As the court explained, the advisory guidelines sentencing range is only "the starting point and initial benchmark" from which sentencing courts should begin to make their sentencing determinations. *Id*. at 596. In addition to the advisory guidelines range

courts must consider the eight other co-equal sentencing factors enumerated in 18 U.S.C. § 3553(a) in determining the appropriate sentence in each case. See, *United States v. Booker*, 125 U.S. 738, 764-65 (2005)[3]

The overriding principle and basic mandate of § 3553(a) requires district courts to impose a sentence "sufficient but not greater than necessary" to comply with the purposes of sentencing set forth therein. Here, a sentence within the advisory guideline range recommended by the Government is "greater than necessary" to meet § 3553(a)'s just punishment goals given Kinga's history and character, her devotion to her family, substantial assistance to law enforcement, lack of concern that the public needs protection from her, and the future likelihood she will remain a valuable and contributing member of society. Kinga Politanska therefore, respectfully requests that this court impose a below guideline sentence taking into consideration all sentencing options irrespective of the guidelines.

### A. An Individualized Assessment of Kinga's Personal History and Characteristics Merits Consideration for a Downward Departure Including a Non-Custodial Sentence

In *Koon v. United States*, 515 U.S. 81, 113 (1996), the Supreme Court acknowledged that "it has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometime mitigate, sometimes magnify, the crime and the punishment to ensue." Judge Rakoff captured the idea of § 3553(a)(1) in *United States v. Adelson*, 441 F.Supp. 2nd 506, 513-514 (S.D.N.Y. 2006), aff'd mem., 301 Fed.App.93 (2nd Cir. 2008): "[S]urely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in relation

---

[3] 18 U.S.C. § 3353(a)(2)(A-D) provides in pertinent part, that factors to be considered in imposing sentence include the following: the nature and circumstances of the offense, the history and characteristics of the defendant, the seriousness of the offense, promotion of respect for the law, just punishment for the offense, deterrence of criminal conduct, protection of the public from further crimes of the defendant, and to provide the defendant with needed educational and vocational training, medical care, or other correctional treatment.

to the context of his life overall hitherto, it should be at the moment of his sentencing when his future hangs in the balance."

Kinga has been a devoted mother to her children, an integral factor in their lives, and a contributing member to society. We respectfully submit the character revealed by Kinga's life until now as well as her efforts to right the wrong she has committed, merit a non-custodial sentence.

> **1.** **Kinga's background and personal circumstances provide the proper context to consider her conduct.**

Portions of Pages 10-21 will be filed under seal pursuant to court order dated February 14, 2020.

Portions of Pages 10-21 will be filed under seal pursuant to court order dated February 14, 2020.

Portions of Pages 10-21 will be filed under seal pursuant to court order dated February 14, 2020.

Portions of Pages 10-21 will be filed under seal pursuant to court order dated February 14, 2020.

Portions of Pages 10-21 will be filed under seal pursuant to court order dated February 14, 2020.

    **2.**      **Kinga's status as a victim of systematic physical and mental abuse independently supports a decision to impose a non-custodial sentence.**

Portions of Pages 10-21 will be filed under seal pursuant to court order dated February 14, 2020.

Portions of Pages 10-21 will be filed under seal pursuant to
court order dated February 14, 2020.

Portions of Pages 10-21 will be filed under seal pursuant to court order dated February 14, 2020.

Portions of Pages 10-21 will be filed under seal pursuant to court order dated February 14, 2020.

**3.** **Incarceration would have a devastating impact on her children.**

Portions of Pages 10-21 will be filed under seal pursuant to court order dated February 14, 2020.

Portions of Pages 10-21 will be filed under seal pursuant to court order dated February 14, 2020.

Portions of Pages 10-21 will be filed under seal pursuant to court order dated February 14, 2020.

**B.** **The Letters of Character Describe a Person Who Has Demonstrated True Character and Decency**

As evidenced by her guilty plea, as well the Government's version, this court has learned

about the worst decisions and conduct of Kinga's life. However, this court, through the character

reference letters submitted on Kinga's behalf, has the opportunity to see Kinga through the lens and experience of others.[6]  The person that emerges from this more fully drawn picture, while admittedly guilty of wrongdoing, has lived a significant portion of her life in ways that demonstrate true character and decency.

Candace Boyle, a Christian minister and friend, describes Kinga as "an extremely kind and caring individual who always puts others (especially her children) before her own needs."

"Mrs. Politanska is a very trusting person with a very big heart which can make her a target of those who may have ill-willed intentions.  [She] has been severely taken advantage of by this type of person in the past due to her trusting and loving nature."  (*Exhibit No. 13(c)*)

According to her longtime friend, Erica Swansey, a realtor and interior designer, Kinga has a heart of gold.

"A wonderful woman, mother, wife, and friend.  Kinga would give the shirt off her back to someone in need at the drop of a dime … she has also been raising three young children and is an extremely hard worker and business woman for her family.  I have never known Mrs. Politanska to be anything but a fantastic and upstanding citizen."  (*Exhibit No. 13(d)*)

Kayme Crowell, a friend and Director of Sales at Pres On says "there isn't anything she wouldn't do for a friend or her children."  (*Exhibit No. 13(e)*)

Kinga's giving nature was not lost on Elizabeth Carroll, a friend for over 19 years who describes Kinga as a "loyal friend, a dedicated family member, and it[sic] recent years a fantastic mom."  (*Exhibit No. 13(f)*)

Others have observed how Kinga's trusting nature has led to others taking advantage of her.  Christian Bremmer, an attorney and good friend, describes her as "an empath, too trusting often for her own good and frequently taken advantage of."  (*Exhibit No. 13(g)*)

Kayme Crowell elaborates further regarding Kinga's trusting nature,

---

[6] The letters of character are attached as *Group Exhibit Nos. 13(a) – (j)*.

"Through the years I have seen her go through ups and downs. Her downs were typically when she was craving love and acceptance by the men in her life who weren't available for her. They sniffed out her weakness and began their destruction." (*Exhibit No. 13(e)*)

This same observation is echoed by Robert Beck, an insurance agent and another longtime friend. (*Exhibit No. 13(h)*)

Finally, Ms. Cameli shares her opinion on the impact incarceration will have on this fragile woman,

"Jail time will only serve to make the monster [Ristik] win. I believe he will take her daughter and home, the last two things she has, away from her…. Our old Kinga Politanska is re-emerging. What she needs is access to mental health services to be able to build herself back up to the strong woman she once was." (*Exhibit No. 13(a)*)

The letters submitted demonstrate Kinga's true character far better than this submission can. Her acts of goodness, friendship, and dedication to her children are real and must be part of this court's sentencing decision.

### C. A Sentence Below the Advisory Guidelines Which Does Not Include Incarceration Would Afford Adequate Deterrence

It is respectfully submitted that a guideline range sentence is not necessary to satisfy § 3553(a)'s requirement of deterrence. Although Kinga's wrongdoing spanned several months, she has spent the overwhelming majority of her life conforming her conduct to the requirements of the law. Although she does have a limited state criminal history, as an employed 46 year old woman with three children, it is unlikely that she will commit further crimes.

The Seventh Circuit has recognized that a judge "should consider general deterrence but must also hand down an individualized sentence." *U.S. v. Moltom*, 743 F.3d 479, 486 (7th Cir. 2014) (quoting *Gall*, 552 U.S. at 50), see also *U.S. v. Brubaker*, 663 F.2d 764, 769 (7th Cir. 1981) ("consideration of general deterrence is proper provided that it does not result in a mechanistic imposition of a sentence.")

It is respectfully submitted that the prosecution and conviction of Kinga, coupled with a below guidelines sentence that does not include incarceration is more than enough to adequately deter her. Such punishment would be just in that Kinga has already suffered greatly as a result of this investigation and will undoubtedly continue to do so regardless of the sentence imposed. The charges against her and her guilty plea have caused shame and embarrassment. From the earliest stages of this case she has readily accepted responsibility for her conduct and attempted to make amends by providing substantial assistance to the government. Her efforts to lead her children by example have taken a serious hit. All of these factors present strong deterrence.

**D.      There is No Concern The Public Needs to be Protected From Further Crimes of Kinga**

As pointed out earlier, Kinga is a 46 year old single mother of three children, the youngest just five years old. Almost her entire life she has endured physical and emotional abuse at the hands of persons she trusted. She has a limited criminal history and has received treatment for anxiety, depression, and post-traumatic stress disorder. She poses no risk of violence and there is absolutely no reason to believe she will engage in another crime. Since her indictment she has tried to make amends for her conduct by readily accepting responsibility, substantially assisting the government against others, and changing her lifestyle. See *Gall*, 552 U.S. at 59 ("Gall's self-motivated rehabilitation… lends strong support to the conclusion that imprisonment was not necessary to deter Gall from engaging in future criminal conduct or to protect the public from his future criminal acts.")

It also must be mentioned that older persons – those over 40 – present a low risk of recidivism. Recently, courts have declined to impose guideline sentences on defendants who are over the age of 40 on the grounds that such defendants exhibit markedly lower rates of recidivism in comparison to younger defendants. See *Simon v. U.S.*, WL 711916 at 4 (E.D.N.Y.,

March 17, 2005) (imposing a term of incarceration of 240 months on a 43 year old defendant convicted of conspiracy to distribute cocaine and using a firearm in relation to that conspiracy where the guidelines recommended a minimum of 324 months); *U.S. v. Nellum*, 2005 WL 30073, at 3 (N.D. Ind., February 3, 2005) (imposing a term of incarceration of 108 months on a 57 year old defendant where the guidelines recommended a minimum of 168 months); see also United States Sentencing Commission, *Measuring Recidivism: The Criminal Computation of the Federal Sentencing Guidelines*, at 5, 28 (2004) (stating that for those defendants in criminal history category one the recidivism rate for defendants who are between the ages of 41 and 50 is 6.9% whereas the recidivism rate for such defendants who are between the ages of 31 and 40 is greater than 12%) available at http://www.ussc.gov/publicat/ recidivism/general.pdf.

For these reasons a non-custodial sentence will adequately protect the public from any further crimes of Kinga particularly since recidivism is unlikely given Kinga's age.

**E.    A Non-Custodial Sentence Would Constitute a "Substantial Restriction of Freedom" Sufficient to Punish Kinga For the Conduct For Which She Has Accepted Responsibility**

In *Gall*, the Supreme Court observed that probation "rather than an act of leniency is a substantial restriction of freedom" 552 U.S. at 44, see also *U.S. v. Warner*, 792 F.3d 847, 860 (7th Cir. 2015) (same, and affirming term of probation "as a sufficiently serious sentence.")

Because bank fraud is a Class-B offense, probation is not an authorized sentence. However, home confinement coupled with supervised release can be equated to probation in terms of its restrictions on freedom. In *U.S. v. Coughlin*, 2008 WL 313099 at 5 (W.D. Ark., February 1, 2008) the court recognized that home detention as well as probation can be severe punishment hugely restrictive of liberty, highly effective in the deterrent of crime, and amply retributive in that "[n]ot all defendants must be sentenced to imprisonment to be duly punished." In fact, the *Coughlin* court noted that the defendant's sentence of home detention more so than

Gall's sentence of probation, subjected Coughlin to a hugely restrictive regime of confinement, compliance, intrusion, and dependency

> "Since [his home confinement began]… he has been restricted to within ten feet of his residence. Probation officers enter his home to check the electronic monitoring system installed there…. He has been permitted to leave his property only on a handful of occasions for church, medical appointments, legal consultations, and his sister's funeral. On all of these occasions, Coughlin was subject to reporting requirements and his movement was closely monitored and recorded with GPS equipment. His punishment is far from the act of leniency and its characterization as such deprive sentencing courts of a valuable and effective form of punishment."

*Coughlin* at 6.

Kinga respectfully requests that this honorable court impose a non-custodial sentence; specifically home confinement and supervised released along with a variety of discretionary conditions, any violation of which can be grounds for revocation and the imposition of a term of incarceration.

## V.    CONCLUSION

Based on the following, Kinga Politanska respectfully requests that this honorable court impose a below guidelines sentence, when it considers all sentencing options. We especially request this court to consider a non-custodial sentence, such as home confinement, supervised release, and restitution. Such a sentence would allow Kinga to receive the psychological treatment she requires while at the same time being subject to restrictions of her freedom. As Judge Hellerstern said in *U.S. Kloda*, 133 F.Supp. 2d, 345 (S.D.N.Y., 2001) "[A] judge must

sentence…without ever being indifferent to a defendant's plea for compassion, for compassion is also a component of justice."

Dated: February 18, 2020

Respectfully submitted,

/s/ Ronald D. Menaker

Ronald D. Menaker (ARDC No. 1884425)
ronald.menaker@saul.com
Nancy DePodesta (ARDC No. 6217407
nancy.depodesta@saul.com
Saul Ewing Arnstein & Lehr LLP
161 North Clark Street
Suite 4200
Chicago, Illinois 60601
(312) 876-7100

*Attorneys for Defendant Kinga Politanska*

**<u>CERTIFICATE OF SERVICE</u>**

I, Ronald D. Menaker, hereby certify that on February 18, 2020, the foregoing was electronically filed via the Court's CM/ECF system and served to all registered attorneys of record via electronic mail.

Dated: February 18, 2020

/s/ Ronald D. Menaker